**LEE et al.   v.   THORENSON et al.**

No. 7320.

Supreme Court of North Dakota.

Aug. 25, 1954.

Asmundur Benson, Bottineau, for appellants.

W. H. Adams, Bottineau, McGee & McGee, Minot, for respondents.

SATHRE, Judge.

This action arose out of a controversy between residents of Brander, Kane and Tacoma Townships, Bottineau County, and the Board of Drain Commissioners of Bottineau County relative to the construction of a proposed drain designated as Kane-Tacoma Drain No. 2. The proceedings were had under the provisions of Chapter 61–21, NDRC 1943, prescribing the procedure for establishing drainage projects.

On November 15, 1950, a petition was filed with the Board of Drain Commissioners of Bottineau County for construction of the proposed Kane-Tacoma Drain No. 2, which petition was signed by the requisite number of freeholders and was in form as required by Section 61–2110, NDRC 1943. It described the point of origin, general course, terminus and the laterals of the proposed drain.

At the time of the filing of the petition the members of the Board of Drain Commissioners were Fred A. Gessner, Bert Henry and Rex Stair. Section 61–21031 1953 Supp. NDRC 1943 provides that no member of the drain board, appointed, qualified and acting under the provisions of Chapter 61–21, NDRC 1943 shall act on any matter wherein he is interested. It was found that Rex Stair and Bert Henry had land within the area of the proposed drain, and they resigned from the Board of Drain Commissioners. Elmer Issendorf and George Thorensen were appointed to succeed them and thereafter they qualified as members of the drain board. After the filing of the petition for construction of the proposed drain a number of meetings were called by the drain board which were attended by many of the landowners in the drainage area, and a majority of them were in favor of the construction of the drain. The drain board contacted the United States Soil Conservation office at Westhope, North Dakota, and consulted with one Mr. Brown, the engineer in charge of said office. He in turn consulted with C. A. Haskin, U. S. Soil Conservation engineer at Fargo, North Dakota, head of the soil conservation in the state. The soil engineers made surveys of the area of the proposed drain, in 1949, 1950 and 1951. The surveys were revised from time to time, and a plat of the final survey was made and accepted by the drain board, and on August 13, 1951 a meeting was called by the board to be held on August 30th, 1951 in the gymnasium of the school house in Newburg in said Bottineau County. Notice of this meeting was given to all affected landowners and published as required by law. Prior to the meeting of the drain board on August 30, several landowners in the area of the proposed drain, filed written objections to the construction of the drain and petitioned for discontinuance of the project.

The proceedings at this meeting were conducted in accordance with the provisions of Section 61–21141, 1953 Supp. NDRC 1943, and the voting rights of the affected landowners were determined by the formula provided by Section 61–21151 1953 Supp. NDRC 1943, which sections are as follows: 61–21141,

"When the hearing provided for in section 61–2114 of the North Dakota Revised Code of 1943 is held, the board shall first prepare a roster or roll of

affected landowners and shall limit voting rights to such affected landowners. A record shall be made by the board of affected landowners present in person or by agent and such records shall be preserved in the minutes of the meeting. Affected landowners shall then be informed of the probable total cost of the project and their individual share of such costs. A reasonable time shall be afforded landowners to discuss and hear the evidence and opinion for and against the project and the board shall fix a time within which objection to the establishment of the drain as provided by section 61–2115 of the North Dakota Revised Code of 1943 shall be filed with the board. Such objections shall be in writing, but a telegram shall be deemed writing, and any form of written objection that sufficiently indicates the intention of the writer shall be sufficient. Once the deadline for signing objections has been reached, no further objections can be filed and no person objecting shall withdraw his or her name from the list of those objecting after the deadline for filing objections has been reached. Any withdrawals of objections before that time shall be in writing only, under the same rules as govern the making of objections. When the objections of affected landowners have all been filed and the deadline for filing objections has been reached, the board shall immediately proceed to determine whether or not a majority voice or vote as determined by section 6 herein (61–21151) is opposed to the construction of the drain. Until such determination is made, the board is without jurisdiction to take any further steps in the matter except to determine whether a majority voice or vote is objecting or not to adopt the required resolution for discontinuance, if a majority objects. (Approved March 19, 1949, emergency.)"

"61–21151. In order that there may be a reasonably fair relation between the amount of liability for assessments and the power of objecting to the establishment of a proposed drain, the voice or vote of affected landowners on the question of establishing the drain shall be arrived at in the following manner:

"1. Every landowner shall have at least one vote or voice.

"2. In addition thereto each landowner shall have one additional voice or vote for each $100.00 or major fraction thereof of assessment that his land is subject to as established by the board under the provisions of section 4 of this Act (61–21131). (Approved March 15, 1949, emergency.)"

At the August 30th meeting a roll call vote was taken of all the landowners present on the question whether the proposed drain should be constructed. By applying the formula provided by said section 61–21151 it was found that 304 votes were cast, of which 224 were cast in favor of the construction of the drain and 80 votes were cast against it, and it was determined that a majority of the affected landowners were in favor of construction of the drain.

Thereafter and on September 5th, 1951, the drain board issued its order establishing said Kane-Tacoma Drain No. 2. The order stated that:

"A petition for the location and establishment of a drain, having been on the 15th day of November A.D.1950 filed with the Board of Drain County Commissioners, in and for Bottineau County, State of North Dakota; and said Commissioners on the 5th day of Sep A.D.1951, having personally viewed and examined the route of such proposed drain, and the land intended to be drained thereby; and it appearing to said Board that such drain is necessary and for the public good, and that it will be of benefit to the public health, convenience and welfare; and that the petition as filed with the Board is sufficient under the law; and that there was and is sufficient cause for

the making of such petition; and also that the construction of such drain will not cost more than the amount of benefit to be derived therefrom; and said Commissioners having caused a survey and measurement of the line of said proposed drain to be made by a competent surveyor, establishing the commencement and terminus of said drain, determining the route, width, length and depth thereof; and said surveyor having prepared profiles, plans and specifications of the proposed drain, and an estimate of the cost thereof, and a plat of the land to be drained, showing the regular subdivisions thereof, all of which are now on file in the office of the Auditor of said County, and on file in the office of this Board, subject to inspection;"

Then follows a detailed description of the point of beginning of the drain, its general course, its laterals and its terminus. Notice of said order and a copy thereof were sent to each landowner affected by said order which notice stated that such landowner had the right to appeal to the district court of Bottineau County, and that such right of appeal would expire in thirty days, and that the date of expiration of such right of appeal was October 29, 1951. The objectors to the construction of said drain, the appellants herein, appealed to the district court of Bottineau County from the order of the drain board, and the appeal was heard before the Hon. Harold B. Nelson, District Judge without a jury.

The court affirmed the proceedings had by the Board of Drain Commissioners and found as facts that the Board of Drain Commissioners was a legal board and qualified to act on all matters presented to it pertaining to drainage and that all proceedings had by the board in establishing Tacoma-Kane Drain No. 2, were regular; that there was necessity for establishing said drain and that the benefits thereof were in excess of the cost thereof. Judgment was entered accordingly and the appellants appealed and demanded a trial de novo in this court.

Appellants contend that the members of the board of drain commissioners were disqualified to function as commissioners for the reason that they failed to subscribe and file their oaths of office in the office of the county auditor within the time required by section 61–2105, NDRC 1943. This section provides:

"Any person appointed as a member of the board, within ten days after his appointment, shall take, subscribe, and file in the office of the county auditor on oath faithfully to perform the duties of a drain commissioner under the law, and at the same time he shall make, execute, and file in the auditor's office a bond to the county with sureties to be approved by the auditor in such sum as shall be ordered by the board of county commissioners, conditioned for the faithful discharge of his duties as drain commissioner."

Appellants' exhibits 1, 1a, 2, 2a, 3, 3a, 8, and 8a show that Fred A. Gessner, president of the board was appointed September 8, 1949, signed the oath of office September 15, 1949, and filed it with the county auditor September 26, 1949. George Thorensen and Elmer Issendorf were appointed February 6th, 1951, took the oaths of office March 9, 1951, and filed them with the county auditor April 9, 1951.

It is clearly established by the record that the board of drain commissioners took no action in the proceedings for establishing the drain involved here until after each of the members of the board had qualified by taking the required oath and filing it with the county auditor together with the certificate of the state commissioner of insurance that such member was bonded as required by law.

The rule as to the effect of failure to qualify within the time prescribed by statute is stated as follows in 67 C.J.S., Officers, § 41, page 194.

"A failure to qualify for an office may create a vacancy in the office, but it has been held that, in the absence of a statute so providing, a failure to

qualify, although it may afford cause for forfeiture of the office, does not create a vacancy; and, even though it is irregular and improper to induct one into office without the required bond having been given, such a one is legally in office and so remains until removed by judicial process, and if the oath is taken or the bond filed at any time before proceedings are taken to declare a vacancy it is sufficient."

No action was instituted before the county commissioners to declare vacancies on the Board of Drain Commissioners, nor was any other action brought for such purpose. The Board of Drain Commissioners was a legally constituted board when the members thereof had subscribed and filed their oaths of office in the form provided by law. Under the facts and circumstances in the instant case, the failure of the members of the board to subscribe and file their oaths of office within ten days as provided by Section 61-2105, supra was not such an omission as to affect their qualifications to function as a Board of Drain Commissioners. The essential requirement is that the members of the board must subscribe and file their oaths of office before entering upon the discharge of their official duties.

Appellants contend further that the cost of the drain exceeds the benefits that would be derived from its construction.

Several of appellants' witnesses testified that the drain if constructed would be an expense to them and of no benefit. Their testimony was in the main conclusions and was not supported by any specific facts and therefore were of little probative force.

Mr. C. A. Haskin, drainage engineer for the U. S. Soil Conservation of North Dakota, a witness for the respondents, testified as follows:

He was at the head of the Soil Conservation at Fargo, North Dakota as drainage engineer. He inspected the area of the proposed drain in June 1949, in August 1949, in the spring of 1950, and in August 1951. He checked the final drawings and map of the proposed drain in February or March 1951. He stated that when he first examined the proposed drainage project at least 500 acres were definitely under water; other lands that were seriously damaged by being too wet to be worked would probably be about 1,700 to 2,000 acres, and in his opinion as an engineer this number of acres could be reclaimed by the construction of the proposed drain. He stated there would be 17.8 sections of land or approximately 11,000 acres within the drainage area of the proposed drain that would be benefited by the project. With reference to the method used in preparing plans for drainage projects he testified as follows:

"Q. Mr. Haskin, in making the plans and specifications or plans for this ditch, how did you arrive at the size of the ditch? A. The size of the ditch was arrived at from standard engineering work as to runoff. It is a standard practice of most engineers. These runoff figures are for certain areas depending on steepness of the land. We call them the runoff curves. They give the amount of runoff per square mile for this sized area and for different slopes.

"Q. Have you done considerable drainage work in North Dakota? A. Yes, I couldn't say how many jobs, but it runs up in the hundreds.

"Q. Mr. Haskin, this Exhibit 11, this long exhibit, does the drawing Exhibit 11, the plan of this ditch,— you may state whether or not that plan represents your best judgment for the construction or for the drainage of this area? A. Yes, it does.

"Q. And you have been engineer on construction of hundreds of ditches in North Dakota? A. Yes.

"*    *    *    *    *    *

"Q. In your plans here you have taken advantage of the lay of the land there, according to your plan, to get the most water out of there that it is possible to get? A. Yes, we have routed the ditch so that it, you might

say, catches the largest amount of water along its course and also taking into consideration we have routed it so that it is the cheapest ditch that could be built along that area.

"Q. This ditch as estimated here would cost approximately fifty thousand dollars. In your opinion as a drainage engineer, would the benefits exceed the cost of the ditch? A. Yes, it is my belief that the benefits would exceed the cost of the ditch.

"Q. That is your judgment as a drainage engineer? A. Yes.

"Q. Now this work you did here you did on request from the drainage board as part of your duties as a Federal employee? A. Yes. I might answer that this way: we have a working agreement with the Mouse River Soil Conservation District whereby we furnish engineering service to them in their soil, water and conservation work, providing they have the men to do the work.

"Q. The Government provides that? A. Yes. That is done without cost to the drainage board".

With reference to the cost of the proposed drain he, Haskin, stated that it would be $49,947.18 exclusive of the cost of easements, and that approximately one third thereof or $17,153 would be paid jointly by the State Water Conservation and Bottineau County.

Mr. Haskin testified further that in his judgment as a drainage engineer the benefits from the construction of the proposed drain would exceed the cost of its construction.

Arlie Oman, a licensed civil engineer testifying for the respondents stated that he was employed by the Soil Conservation Service, and that he and one Richard Moum, another civil engineer in the employ of the Soil Conservation Service, made the survey for the Kane-Tacoma Drain No. 2 under the supervision of the Chief Engineer, C. A. Haskin. He described in detail the laying out of the course of the drain, the depth at the various surface elevations, and what gradient the drain should have when designed. He stated that when he was making the survey there were four hundred or five hundred acres under water, and that from 1,600 to 2,000 acres of land could be reclaimed by the construction of the proposed drain, and that there were some seventeen sections of land included in the drainage area. The approximate length of the drain, including its laterals, would be eleven miles. The outlet of the drain was a coulee emptying into the Mouse River. He stated further that in his judgment the construction of the drain in accordance with the survey made represented the most practical method of reclaiming the land in the drainage area, and that there was a necessity for construction of the proposed drain in order to reclaim the lands in the area. The testimony of Richard Moum a civil engineer with the Soil Conservation Service, testifying for the respondents, agreed in detail with the testimony of Arlie Oman whom he assisted in making the survey for the proposed drain.

The minute book of the Board of Drain Commissioners was introduced in evidence as appellants' exhibit 6. It contains a record of all of the proceedings had in the matter of establishing Kane-Tacoma Drain No. 2, including the petition for establishing the drain, the action taken by the board for surveys, notice of hearing on said petition, minutes of the hearing thereon, order establishing the drain and notice of the entry of such order.

Exhibit 15 is a recapitulation of the estimated cost of the drain and assessments made by the drain board against each parcel of land benefited by the drain. Attached to said recapitulation is a schedule describing each parcel of land, the amount of assessment and listing the name of the owner.

Appellants argue that the landowners who presented petitions to the drain board at the August 30th meeting objecting to the construction of the drain constituted a majority of the landowners affected and that

under Section 61–2115, NDRC 1943 it was the duty of the drain board to discontinue the proceedings for construction of the drain. Section 61–2115 is as follows:

"If a majority of the landowners whose land is subject to assessment for the construction of the proposed drain petition the board to have further proceedings discontinued, the board, by resolution, shall order further proceedings discontinued."

The petitions of the objectors to the construction of the drain are appellants' exhibits 4 and 5. Exhibit 4 contains 12 names and recites that the petitioners are the owners of two quarter sections of land in the area of the proposed drain and states that the drain will affect their lands and will do more harm than good. Exhibit 5 contains 15 names and recites that the petitioners are landowners affected by the proposed drain and that they are opposed to it, but the petition does not show the acreage of land of which the petitioners are the owners.

Section 61–2115 quoted by appellants must be construed together with Section 61–21151, Supp. NDRC 1943 quoted elsewhere in this opinion. Said section prescribes the formula by which the drain board shall determine the voting rights and number of votes to which each landowner is entitled. Exhibits 4 and 5, the petitions of the objectors to the drain, were considered by the drain board at the meeting on August 30, 1951. In tabulating the number of votes to which each of the landowners was entitled under said formula it was found that 224 votes were cast in favor of construction of the proposed drain and 80 votes were cast against it, and it was determined by the drain board that a majority of the affected landowners were in favor of construction of the drain. The appellants presented no competent evidence that the drain board erroneously determined the total number of votes cast or the number of votes to which each affected landowner was entitled. The district court found as a fact that the petitions for discontinuance of the proceedings for con-

struction of the said drain were insufficient and contained the names of less than a majority of the landowners affected by the drainage project.

After a careful consideration of the entire record we are agreed that the district court correctly affirmed the proceedings had by the Board of Drain Commissioners.

The judgment is affirmed.

MORRIS, C. J., and BURKE and GRIMSON, JJ., concur.

JOHNSON, J., did not participate.